Philip Shore and Ann E. Shore, et al. [1] v. Commissioner. Shore v. Commissioner
Docket Nos. 64818-64820, 64840, 64874, 71532, 71534. Memo. 1959-166.
United States Tax Court
T.C. Memo 1959-166; 1959 Tax Ct. Memo LEXIS 83; 18 T.C.M. (CCH) 721; T.C.M. (RIA) 59166; August 27, 1959
*83 (1) Held, distributions from a Cuban corporation to its shareholders, citizens of the United States, were not distributions in liquidation within the meaning of section 115(c), I.R.C. of 1939. (2) Held, amounts expended by a corporation for the purchase and installation of marine engines in a ship owned by it were ordinary and necessary business expenses within the provisions of section 23(a)(1)(A), I.R.C. of 1939. John J. Trenam, Esq., Citizens Building, Tampa, Fla., and Sherwin P. Simmons, Esq., for the petitioners. Roger L. Davis, Esq., for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: The respondent determined the following deficiencies in income tax and additions to tax under sections 294(d)(1)(A) and 294(d)(2) of the Internal Revenue Code of 1939[2] for the years indicated: Additions to tax under sections
Docket No.
Year
Deficiency
294(d)(1)(A)
294(d)(2)
64818
1952
$ 987.30
$221.32
$132.80
64819
1952
595.16
64820
1952
63,951.05
64840
1952
981.20
136.18
64874
1952
3,725.29
71532
1953
5,818.44
71534 (fiscal)
4-30-53
22,596.80 *
Additional deficiency for
fiscal
4-30-53
6,987.61 **
*84 Because of similar questions of law and fact these seven cases were consolidated on trial. The issues to be decided are: (1) Whether certain distributions in 1952 from a Cuban corporation, Compania de Vapores Insco, S.A., to its shareholders, petitioners here, were dividends within section 115(a) or were distributions in liquidation within section 115(c); (2) Whether amounts expended by a corporation, Insco Trader, Inc., for the purchase and installation of marine engines in a ship owned by it were ordinary and necessary business expenses within the provisions of section 23(a)(1)(A). At the trial the issue involving additions to tax in Docket No. 64818 was conceded by petitioners, subject to a recomputation under Rule 50. The addition to tax in Docket No. 64840 has been conceded by petitioners to be proper in the event respondent prevails on the dividend issue. The amendment to the answer, claiming additional deficiency in Docket No. 71534 of $6,987.61, was made necessary by a concession which is explained later, and no real issue exists because of such amendment. *85 Findings of Fact Some of the facts were stipulated by the parties. They are herein found as stipulated. Petitioners in Docket No. 64818, Philip Shore and Ann E. Shore, his wife; petitioners in Docket No. 64819, John K. Wales and Iryene L. Wales, his wife; and petitioners in Dockets Nos. 64820 and 71532, George F. Milliken and Virginia W. Milliken, his wife, all reside in Tampa, Florida. Petitioners in Docket No. 64840, Joseph D. Bennett and Virginia H. Bennett, his wife, reside in Bellair, Florida. Petitioners in Docket No. 64874, H. V. Monahan and Mary Pearson Monahan, his wife, reside in Dunedin, Florida. All of the above named petitioners were and are citizens and residents of the United States. In each case above, petitioners filed timely joint income tax returns for the taxable year 1952 (and in Docket No. 71532 for the year 1953) with the district director of internal revenue for the district of Florida. Petitioner in Docket No. 71534, Intercontinental Shipping Corporation, is a Delaware corporation of which George F. Milliken is president. During the years in question he and members of his family owned over 50 per cent of the shares of the corporation. The corporation *86 filed timely income tax returns with the district director of internal revenue for the district of Florida in respect of its fiscal years ending April 30, 1952 and 1953 under an accrual method of accounting. The individual petitioners are United States taxpayers, former shareholders in a corporation organized in 1951 under the laws of the Republic of Cuba. The corporation, Compania de Vapores Insco, S.A. (hereinafter referred to as Vapores) was organized for the purpose of transporting Chrysler automobile products to Cuba for sale. The Intercontinental Shipping Corporation (hereinafter sometimes referred to as Intercontinental) during all the years in question and for some time prior thereto was in the business of maritime shipping. Prior to 1951 it had been transporting Chrysler automobile products from the United States to distributors in Cuba. Intercontinental had been charging somewhat lower rates than those charged by other shipping companies which were members of a maritime conference. Sometime prior to February 1951 the Chrysler Corporation required that all vehicles shipped to Cuba be carried in ships belonging to the Gulf of Havana Steamship Conference. Intercontinental *87 was not a member of the conference. Its president, petitioner George F. Milliken, approached the Cuban distributors of Chrysler products with the proposition that a Cuban shipping corporation be formed which would join the conference and thus qualify as to the Chrysler Corporation's requirement. He pointed out that the Cuban dealers, by owning stock in the corporation, would decrease the amount of the shipping charges on cars and trucks by the amount of their share of the profits in the corporation. The Cuban dealers readily agreed to this proposition and the organization of Vapores was planned. By agreement with the Cuban businessmen, the Cubans were to own 40 per cent of the stock of Vapores and the remaining 60 per cent was to be held by citizens of the United States. In February 1951, Milliken sent a letter to the shareholders of Intercontinental inviting them to participate in subscribing to the stock of Vapores, on the basis of their stock holding in Intercontinental, and he proposed that the stock thus subscribed be held in a voting trust (with Milliken as trustee) for 10 years with voting trust certificates to be issued as evidence of individual participation therein, and *88 to regulate participation in any dividends Vapores might pay. In pursuance of the voting trust agreement 840 shares were subscribed to by several United States citizens, including petitioners Shore, Wales, Milliken, Bennett and Monahan, in the following amounts: Subscriber
Shares
George F. Milliken
382
Virginia Milliken
169 1/2
Philip Shore
35
J. K. Wales
27
J. D. Bennett
36
H. V. Monahan
77 1/2
Yvonne J. Johanns
51
J. E. Milliken
15
R. D. Lacy
35
E. W. Wight/V. W. Milliken
5 1/2
Ann M. Murphey
6 1/2
840
In March, 1951, the United States subscribers to the stock of Vapores entered into a voting trust agreement in which Milliken was named voting trustee. Vapores issued 840 shares of stock to Milliken as voting trustee and he, in turn, made out certificates of participation to the United States subscribers to Vapores. At about the same time Vapores issued 560 shares of its stock to Cuban subscribers. Shortly thereafter the corporation commenced its shipping operations and Milliken was elected its president. Vapores had no fixed assets and no American office. Vapores was an operating company, chartering boats on the open market for short-term *89 shipping contracts. It entered into an agency agreement in which Intercontinental acted as its general agent in the United States and F. A. Rovirosa as its general agent in Cuba. Vapores handled the shipment of Chrysler built automobiles and trucks to Cuba and sugar products on the return trips. It prospered greatly so that by January 1952 the corporation had earnings and surplus of approximately $175,000. The Cuban stockholders were anxious to have Vapores declare a dividend. The American stockholders did not wish any declaration of dividends. On January 10, 1952, a special meeting of stockholders was held in Havana and the minutes show Milliken attended this meeting and all of the Cuban shareholders were also present. The minutes of this meeting show the following resolution: "To pospone for the middle of the month of December any resolution declaring dividends or other such corporate particulares [particularies], to be considered in view of the tax laws of Cuba and the United States; * * *" Urgency of the Cuban demands for dividends continued and the earnings of the corporation continued to build up. In June of 1952 the earned surplus of Vapores was approximately $275,000 *90 and on June 4 Milliken was again called to Havana for a special meeting of the board of directors of Vapores. Most all of the shareholders of Vapores were present at this meeting and again there was much discussion over the question of declaring a dividend. Even though the Cubans owned a minority of the voting stock, their actual influence in determining the policy matters of the corporation was greater than their voting interest because they controlled the shipment of automobiles that Vapores was handling. At the meeting of June 4, 1952, the general counsel of Vapores, Jose A. Mestre, was present. Milliken, representing the American shareholders, was against the declaration of a dividend and the Cubans, because of their need for considerable amounts of money, were anxious to have a distribution of the corporate earnings. Mestre put forth a plan whereby the shareholders of Vapores would be allowed to borrow from the reserve funds of the corporation in proportion to their shareholdings. The minutes of this meeting contained the following resolution: "To authorize the Treasurer of this Corporation, Mr. Charles Bunbury, to make loans to individuals up to $250,000.00 at the rate of 1% *91 per year, and for a term not greater than 6 months." Vapores immediately made available in cash a large portion of the surplus which could be drawn upon by the stockholders in proportion to their shareholdings. The Cubans drew their aliquot share and Milliken, as voting trustee, drew upon his share, which amounted to $150,000, as follows: Date
Amount
July 30, 1952
$140,000
September 21, 1952
2,000
October 27, 1952
8,000
Those who drew on the surplus amount were required to sign a document which provided that the loan would fall due on December 10, 1952, and for interest at the rate of 1 per cent payable quarterly. Milliken invested the $140,000 drawn on July 30, 1952, in Government bonds and did not distribute any amount to the certificate holders of the voting trust until October of 1952. On October 27, 1952, Milliken drew the remaining balance of the $150,000 and made a distribution of the amount to the trust beneficiaries at the rate of $180 per share. The minutes of a special meeting of the stockholders of Vapores held in Havana on November 20, 1952, contained the following resolution: "To amortize thirty-three thousand two hundred and fifty dollars *92 of the Social Capital, by means of the cancellation of eight hundred and forty shares at twenty-five dollars each, which were obtained for their cancellation the twentieth of August last, and by means of the cancellation of four hundred ninety shares which are offered in this minutes, and which become useless in themselves, hence the capital in circulation of the company actually becomes reduced to one thousand seven hundred and fifty dollars represented by seventy shares at twenty-five dollars nominal value each." On December 2, 1952, Vapores made a final distribution of $38,697.60 to Milliken, he, having earlier turned in his stock, and Milliken, in turn, distributed this to the certificate holders immediately upon receiving it. Petitioners thus received the following amounts as proceeds from Vapores: Distri-
Distri-
bution
bution
Name
10-27-52
12-2-52
Total
Millikens
$98,392.64
$25,387.32
$123,779.96
Shores
6,244.32
1,611.16
7,855.48
Waleses
4,817.05
1,242.90
6,059.95
Bennetts
6,422.74
1,657.19
8,079.93
Monahans
13,826.71
3,567.57
17,394.28
Vapores, on its books, showed its purchase of stock from Milliken at a total price *93 of $188,697.60 paid for by the corporation with a check for $38,697.60 and a cancellation of the outstanding loans to the full extent of the $150,000. By December, 1952 the corporation had ceased operations and it was dissolved under the laws of Cuba shortly after February 10, 1953. The individual petitioners all reported the funds received from Vapores as long-term capital gains for the year 1952. The Commissioner determined that the original distribution of $150,000 was a dividend within the terms of section 115(a) and was, therefore, taxable as ordinary income. During the years 1952 through 1954 petitioner, Intercontinental Shipping Corporation, had a wholly-owned subsidiary, Insco Trader, Inc., hereinafter sometimes referred to as Insco. Insco was engaged in the business of maritime cargo shipping. Intercontinental is the transferee in liquidation of Insco. During the years in question the principal asset of Insco was the motor vessel INSCO TRADER, an ex-yacht that had been converted to a banana boat and general cargo carrier between Central and South American ports and the United States. The ship had been taken over by the Government in World War II and armed with guns and *94 splinter shields. To maintain stability after these additions the ship was ballasted with pig iron laid on the bottom directly on the skin of the ship. Over a period of time the hull of the INSCO TRADER was badly weakened by electrolysis and as a result its life was shortened. The ship was powered by two marine engines which had been installed as a part of her original equipment when she was built in 1924. Both of these engines were old and worn and constant attention was necessary to keep them in running condition. In 1952 a proper estimate of the remaining useful life of the ship was between five and seven years. Actually the ship sank in 1955. In February of 1952 a crankshaft in the starboard engine broke. No replacement parts were available and in order to repair the engine it would have been necessary to have a new crankshaft specially manufactured by the firm in Denmark which had originally built the engines. To do so would have meant inactivating the ship for 10 or 12 months. On the advice of a marine surveyor, two secondhand engines, built to U.S. Navy specifications during World War II, were purchased. One was installed to replace the inoperative power plant and the TRADER *95 returned to the seaways. In June of 1952 the crankshaft in the port engine broke and the other used Navy engine was installed. The cost of the replacement of the engine in fiscal year ended April 30, 1952 was $51,170.87. The cost of the replacement of the engine in fiscal year ended April 30, 1953 was $57,287.53. Insco, on its income tax returns for its fiscal years 1952 and 1953, treated the amounts $51,170.87 and $57,287.53, respectively, as maintenance expenses and deducted them in their entirety from gross income for those years. Respondent disallowed the deduction of $57,287.53, taken in 1953 as expense. In its 1953 income tax return Insco had utilized net operating loss carry-overs from 1951 and 1952. Respondent corrected the carryover from 1952 by determining the $51,170.87 engine replacement expense taken that year was not allowable. However, the notice of deficiency for the year 1953 explained, and the adjustment taken into account, that the said sums for engine replacement constitute capital expenditures "recoverable through depreciation deductions" as to the engine installed in 1952 over a period of 60 months, and as to the engine installed in 1953 over a period of 54 *96 months. After allowing depreciation deductions in lieu of the repair deductions the result of the adjustment was to increase Insco's taxable income for 1953, which increase is the basis for the determination of deficiency in income tax of Insco (and Intercontinental, as transferee), in Docket No. 71534 of $22,596.80, which is here in issue. The cost of the replacement engines was an ordinary and necessary business expense and not a capital expenditure. Opinion The first question is whether the distribution by Vapores of $150,000 in 1952 to Milliken as voting trustee for the American shareholders was a distribution to said shareholders in liquidation pursuant to section 115(c), as petitioners contend, or whether said distribution was the distribution of ordinary dividends under section 115(a), as respondent contends. The $150,000 distribution was not a bona fide loan even though it was made in the form of a loan. There was no intent to repay the loan.the background of this purported loan convinces us it was no more than a plan to make available to the shareholders the rapidly accumulating profits of the corporation in proportion to their stockholdings. Petitioners' whole contention *97 is that the distribution of $150,000 made after the June 4, 1952 directors' meeting was merely a step in a plan to liquidate the corporation, and, since liquidation followed in December, the earlier distribution of $150,000 was a liquidating dividend, and therefore subject to capital gains treatment. Petitioners cite a number of cases in which the courts have held that where there is a determination and agreement to liquidate, distributions made pursuant to the liquidation plan are held to be liquidating dividends. These cases are not in point. In all of such cases the acts of the corporations following the distributions have been consistent with the winding up of the affairs of the corporations and not consistent with the continuation of the regular business operations of the companies. Such distributions which are held to be steps in a plan of liquidation are usually distributions to the extent that the capital structure of the corporation has been purposely impaired so that it cannot carry on its usual business operations and the circumstances surrounding the distributions clearly indicate that the corporation was in the process of liquidation at the time the distributions were *98 made. It is somewhat significant that the minutes of the June 4, 1952 meeting are completely silent with respect to any plan of liquidation. Milliken and Mestre and one other director all testified there was much discussion about liquidation at the meeting and that after this discussion there was an agreement to liquidate some time in September, or, as Mestre testified, after September 30, when the shipment of the 1952 model Chrysler cars and trucks ended and before the 1953 models began to arrive. Even if we were to accept the testimony of petitioners as to the oral agreement to liquidate, it would amount to nothing more than a plan to carry on business as usual for the next few months and then liquidate. Mestre frankly testified that the plan was designed to help the American shareholders obtain favorable tax treatment and also satisfy the Cubans' demands for their shares of the corporate earnings. Such an agreement as petitioners' witnesses related would not make the distribution of the $150,000 a step in a planned liquidation. It would be nothing more than a distribution of earnings in anticipation of liquidation after the company had, by its usual operations, secured more earnings. *99 Actually the testimony of Mestre was that in June 1952 liquidation "in principle" was agreed upon but all of the witnesses recognized it might not be carried out and in that event return of the distributions could be demanded. Section 115(c) provides that amounts "distributed in complete liquidation of a corporation * * *" shall be treated as payment in exchange for stock. If the distribution is to fall within this section, the company must be in the status of liquidation which implies winding up of the affairs of the company as distinguished from the continuing operations of a going concern. W. E. Guild, 19 B.T.A. 1186. It is not enough that the dividend be in anticipation of the dissolution of the corporation to be accomplished on some future date. When, at the time of the distribution, the company is in a period of active operation and there is agreement among the shareholders for future active operation of the corporation, the distribution is not a liquidating dividend. A corporate distribution which is a mere distribution of profits without in any way affecting the capital *100 of the corporation or its ability to continue its business is not a liquidating dividend, even though there be the intention to liquidate later. E. G. Perry, 9 B.T.A. 796. Here it is to be noted this corporation began business with $35,000 capital and after the $150,000 distribution and the early distributions tocuban shareholders, the corporation still had more than $38,000 of capital which was not distributed until December, when the corporation, having ceased all business, actually liquidated. We hold respondent was correct in his determination that the distribution of $1150,000 was taxable under the provisions of section 115(a), and not under section 115(c). In Docket No. 71534, the question is whether amounts expended by Insco Trader, Inc. for the purchase and installation of two marine engines in a ship owned and operated by it were "ordinary and necessary expenses" paid or incurred during the taxable years 1952 and 1953 in carrying on the corporation's business. Insco Trader, Inc. had as its principal asset a vessel named INSCO TRADER. She was a small ex-yacht, originally built in Copenhagen in 1924 as the yacht Vedette, and propelled with two Burmeister and *101 Waine engines. The vessel had been converted to a cargo vessel and it was used by Insco in fruit and banana shipping. The ship had been taken over by the Government in World War II, armed with guns and ballasted with pig iron which had been laid in the bottom on the skin of the ship. All of the bilge water and fuel oil and pig iron ballast in the bottom of the vessel, over a period of time, had the same effect as a large battery with the result that the plating on the inside of the bottom of the vessel was corroded and eaten away through electrolysis. Sometime around the year 1950 Insco began to use the services of a marine surveyor who did much work for about two years in order to keep the Burmeister and Waine engines running. The marine surveyor was of the opinion that the crankshafts in these engines would not last long and, since replacements could not be obtained, he advised securing secondhand engines, for it would have been foolish to put new engines in the ship with the bottom so eaten away with corrosion and electrolysis. He testified that, because of the condition of the bottom, the life of the ship in 1952 would be limited to five or seven years. Petitioner began to look *102 around for secondhand engines and finally bought two Cooper-Bessemer engines. These engines had been built for the Navy during World War II, used in a tug boat in Mississippi, and then after the war put in storage in New Orleans where they had lain out in the weather. The exact date of Insco's purchase of the engines is not shown. Both engines were purchased some time prior to February 1952 as "spares" and apparently were carried in what the treasurer of Insco called "inventory." In February 1952 the crankshaft of the starboard engine broke and one of the spare engines was installed at a total cost of $51,170.87. The ship operated until June 1952 when the crankshaft of the port engine broke and the second spare was installed at a total cost of $57,287.53. Insco took deductions for the above sums in its income tax returns for the years ended April 30, 1952 and April 30, 1953 as repairs under cost of operation. Respondent does not question the expenditures in the above amounts being made in said years for engine replacement costs, and his adjustment treats them as having been made in said sums and in said years as capital expenditures. In their briefs the parties state the question *103 is whether the engine replacement costs were repair expenses or capital expenditures. There was evidence that only 10 Burmeister and Waine engines had ever been built by the Copenhagen firm; that the other eight were no longer in existence; that only the Copenhagen firm could make a crankshaft for a Burmeister and Waine engine and this would take 10 to 12 months; and if new crankshafts had been purchased and installed the cost would have been about the same as the cost incurred in purchasing and installing the used spares. There was also evidence that the ship operated about the same after the secondhand engines were installed; that it traveled at about the same speed, and both of the replacement engines required much maintenance; and that the ship with the replacement engines installed was of the same value as it had been before the necessity for any engine repair or replacement. There is no simple distinction between a "repair" and a "capital improvement." As stated in Libby & Blouin, Ltd., 4 B.T.A. 910, at p. 914, "An item, which might be classified as a capital expenditure *104 under certain circumstances, may, under different facts and circumstances, be considered expense." The question is one of fact as to the "purpose and effect" of the expenditure. Farmers Creamery Co. of Fredericksburg, Va., 14 T.C. 879. In the oft-cited case of Illinois Merchants Trust Co., Executor, 4 B.T.A. 103, we stated: "A repair is an expenditure for the purpose of keeping the property in an ordinarily efficient operating condition. It does not add to the value of the property, nor does it appreciably prolong its life. It merely keeps the property in an operating condition over its probable useful life for the uses for which it was acquired. Expenditures for that purpose are distinguishable from those for replacements, alterations, improvements, or additions which prolong the life of the property, increase its value, or make it adaptable to a different use. * * *" While it is perhaps true, as respondent argues, that the replacement of an entire engine would ordinarily be considered a capital item, we feel the special facts and circumstances of this case bring the engine replacement expense within the classification of repairs. Clearly the engine *105 replacement expenditures did not have the effect of improving the vessel or adding to its value or useful life. They were expenditures for the purpose of keeping the vessel in an ordinarily efficient operating condition for the remaining five to seven years of the ship's life. As the marine surveyor testified, the vessel without propulsion was merely so much scrap metal. The evidence shows that, because of the condition of the bottom of the vessel it had an extremely limited life. The expenditures for installing secondhand engines were solely to give the vessel the necessary propulsion to the end of that useful life. The expenditures were for items that merely served to restore the vessel to its condition before the crankshafts on the obsolete motors broke, without prolonging the life of the vessel or increasing its value. That the entire engines were replaced by used engines, instead of replacing only the broken crankshafts, is satisfactorily explained. The installation of the used engines, at a cost no greater than crankshaft replacements, was solely for the purpose of doing what replaced crankshafts would do, namely, propel the ship as long as its weak and damaged bottom permitted *106 it to remain afloat. That a replacement can, under certain circumstances, have the same effect as a repair, see Brier Hill Collieries, 12 B.T.A. 500, where, in 1918, the boiler in the taxpayer's mine was accidently destroyed and it was held the labor and material in installing a new boiler were an expenditure for repairs, the opinion stating: "In the instant case, while a new boiler was installed to take the place of the old one, the effect was the same as a repair, since Baker Mine [which closed down in 1920] had a limited life. * * *" To the same effect, in Trustee Property No. 4, 21 B.T.A. 627, where the cost of replanking on a yacht used for business purpose was allowed as expense, the opinion stated: "The work consisted merely of replacing parts of the yacht which had become unserviceable through dry rot in order to place the boat in operating condition, and was not a betterment of such a character that the cost should be capitalized." Under the facts of this case we find the expenditures in question were for the purpose of keeping the vessel in an ordinarily efficient operating condition during the balance of its limited life and the expenditures *107 did not have the effect of improving, increasing the value, or prolonging the life of the vessel. We hold the expenditures for engine replacement in the years in question deductible as business expenses. In this same Docket No. 71534, the notice of deficiency allowed $16,214.34 as a deduction for salary payments by Insco to Milliken in 1952 and 1953. This was an increase of $8,521.47 since Insco had only taken deductions for salary to Milliken in the sum of $7,692.87 for 1953 and nothing in 1952. At the trial respondent conceded Insco had reported the salary deductions for Milliken correctly and he filed an amendment to increase the deficiency of Insco for 1953 by $6,987.61. It is obvious the use of the lower salary deduction, which the record establishes and which Intercontinental argues is correct, would have the effect of increasing the taxable income and resulting deficiency if respondent prevailed on the ship capitalization issue. Since we have held against respondent with respect to the ship capitalization issue, no further issue remains in this docket. Decisions will be entered under Rule 50. Footnotes
1. The following proceedings are consolidated herewith: JOHN K. WALES and IRYENE L. WALES, Docket No. 64819; GEORGE F. MILLIKEN and VIRGINIA MILLIKEN, Docket No. 64820; JOSEPH D. BENNETT and VIRGINIA H. BENNETT, Docket No. 64840; H. V. MONAHAN and MARY PEARSON MONAHAN, Docket No. 64874; GEORGE F. MILLIKEN and VIRGINIA W. MILLIKEN, Docket No. 71532; and INTERCONTINENTAL SHIPPING CORPORATION, Docket No. 71534.↩
2. All section references are to the Internal Revenue Code of 1939.↩
*. Transferee liability - explained later. ↩
**. Transferee liability - claimed in amendment to answer.↩